UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH

LEONEL MIRANDA MARTINEZ                                    PLAINTIFF

v.                                    CIVIL ACTION NO. 5:13-CV-P182-GNS

STEVE HILAND (DOCTOR) *et al.*                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon two cross-motions for summary judgment

(DNs 98 & 99). Fully briefed, these motions are ripe for decision. For the following reasons,

Plaintiff's motion for summary judgment will be denied, and Defendants' motion for summary

judgment will be granted in part and denied in part.

## I. PROCEDURAL HISTORY

Plaintiff initiated this § 1983 action on October 16, 2013, against Defendants Kentucky

State Penitentiary (KSP) Dr. Steve Hiland, KSP Warden Randy White, Kentucky Department of

Corrections (KDOC) Dr. Scott Haas, and the Kentucky Board of Medical Licensure. On April

29, 2014, this Court conducted an initial review of Plaintiff's complaint pursuant to 28 U.S.C.

§ 1915A and dismissed Plaintiff's claims against the Kentucky Board of Medical Licensure as

barred by the Eleventh Amendment (DN 14). The Court also dismissed Plaintiff's claim based

upon his allegations that he was being improperly charged $3.00 co-pays for prescriptions and

medical visits. The Court, however, allowed Plaintiff's § 1983 claims against Dr. Hiland to

proceed for deliberate indifference to serious medical needs, retaliation, and discrimination based

upon race. The Court also allowed Plaintiff's state-law claims to proceed against Dr. Hiland for

negligence, against Warden White for the negligent retention of Dr. Hiland, and against Dr. Haas

for negligent supervision of Dr. Hiland.

On April 25, 2017, the Court granted Dr. Haas's motion for summary judgment (DN 94). On that same date, the Court denied Dr. Hiland and Warden White's motion for summary judgment without prejudice and allowed them 30 days to file a properly supported motion for summary judgment. It is this motion and Plaintiff's cross-motion motion for summary judgment that are now before the Court for review.

## II. FACTS[1]

### A. PLAINTIFF'S MEDICAL TREATMENT AT NTC

Prior to being incarcerated at KSP, Plaintiff was incarcerated at Northpoint Training Center (NTC). Although Plaintiff claims he was diagnosed with a bulging disc while at NTC, his NTC medical records simply reflect that he had been diagnosed with "chronic low back pain." (DN 38-1, p. 3). On September 9, 2009, a physical therapist evaluated Plaintiff and recommended that he be issued a personal "TENS unit"[2] to use for his back pain in conjunction with an exercise program. (DN 1-1, p. 15). At some point, Plaintiff was seemingly moved to a segregation unit at NTC and no longer allowed to keep a TENS unit in his cell. However, he was allowed to use a TENS unit for "30 minutes three times a day at pill call times as needed." (DN 34-9, p. 4).

Additional medical records from NTC also show that Plaintiff had been diagnosed with tinnitus and referred to a specialist for this issue. On April 2, 2010, an NTC healthcare provider

---

[1] During the course of this action, which has been pending for over three years, Plaintiff has filed hundreds of pages of documents with the Court which he has titled "exhibits." In deciding the motions now before the Court, the Court has relied upon only the exhibits that are relevant to the claims the Court has allowed to proceed and that were attached to the following pleadings, motions, or briefs: the complaint (DN 1); Defendants' first motion for summary judgment (DN 34); Plaintiff's response to the first motion for summary judgment (DN 38); Defendants' reply (DN 39); Defendants' second motion for summary judgment (DN 98); and Plaintiff's final response to Defendants' second motion for summary judgment (DN 121).

[2] TENS stands for transcutaneous electrical nerve stimulation and is a back pain treatment that uses low voltage electric current to relieve pain. WebMD, TENS Topical Overview, https://www.webmd.com/pain-management/tc/transcutaneous-electrical-nerve-stimulation-tens-topic-overview (last visited Oct. 18, 2017).

requested a consult with an ENT[3] because Plaintiff had complained of ringing and pressure in his ears for over two years (DN 9-1, p. 4), and had been treated with "multiple combinations of medication without symptom relief." (DN 9-1, p.3). This request for a consult was approved, and Plaintiff was scheduled to see an outside provider on April 5, 2010 (DN 9-1, p. 2). Plaintiff, however, was transferred to KSP in April 2010 and, therefore, did not make this appointment.

## B. PLAINTIFF'S MEDICAL TREATMENT AT KSP

### 1. Lower Back Pain

In his complaint, Plaintiff alleges that when he was transferred to KSP in April 2010, Dr. Hiland discontinued his use of a TENS unit but treated him with prescription naproxen for his chronic lower back pain. Plaintiff filed a grievance related to Dr. Hiland's refusal to issue him on TENS unit in May 2010. In his apparent response to this grievance, Dr. Hiland wrote:

> Mr. Martinez transferred to KSP with a TENS unit. I do not treat back pain with this device. I have been successful in treating back pain with pharmaceuticals. He is no longer at [Kentucky State Reformatory], and I am his institutional physician. This means that I determine the treatment for his complaints. A TENS unit is not appropriate at a maximum security prison because of security risks.

(DN 121-2, p. 7, Information Sheet for Informal Resolution, 5/7/10).

Plaintiff next complains that, beginning in 2013, Dr. Hiland began failing to regularly prescribe him naproxen. The medical records submitted concerning Plaintiff's medical care at KSP begin in early 2011. The first pertains to Plaintiff's annual physical examination on August 30, 2011 (DN 34-14, pp. 1-2). This record reflects that Plaintiff made no subjective complaints regarding his back and that the KSP medical provider who performed the physical found his back to be "normal." (*Id.*). However, a medical record from November 1, 2012, shows that

---

[3] An "ENT" is a medical specialist who is concerned with the diagnosis and treatment of disorders of the head and neck, including particularly the ears, nose, and throat. MedicineNet, ENT Physician, https://www.medicinenet.com/script/main/art.asp?articlekey=25244 (last visited Oct.18, 2017).

Plaintiff had been prescribed "Naproxen 500 mg" tablets to take twice daily for 180 days from July 22, 2012, until January 17, 2013. Plaintiff's medical records next reflect that Plaintiff received a second annual physical examination at KSP, which was performed by Dr. Hiland on December 6, 2012. During this physical, Plaintiff made no subjective complaints regarding his back, and it was again found to be "normal." (DN 34-17, pp. 1-2). These records next show that Plaintiff submitted sick-call slips on February 28, 2013, and March 12, 2013, because his prescription for naproxen had been "cancelled." (DN 34-1, DN 34-2). Because Plaintiff sought a renewal of his prescription pain medication for his back pain, Plaintiff was examined on March 12, 2013. (DN 34-3). During this examination, it was noted that Plaintiff had "no tenderness to vertebral spine to soft tissue of back [and] normal distal sensory and motor functions." (*Id.*) Plaintiff was informed that over-the-counter pain medications were available from the inmate commissary. Plaintiff filed a grievance based upon this recommendation because inmates in segregation could not purchase such medications. (DN 121-2, p. 3). In their response to the grievance, KDOC officials wrote: "The medical director has determined that ASA[4] and Tylenol not be given out to inmates in seg as it can cause problems with medications interactions. Inmates can get an order for these meds by signing up for sick call and the doctor will review the chart, check for an interaction problem and order the meds as needed." (*Id.*).

On April 1, 2013, Plaintiff made a specific request to be seen by Dr. Hiland, writing, "I suffer severe pain due to my back pain, medical been canceled." (DN 34-4). However, on April 10, 2013, Plaintiff signed a "Release of Responsibility Refusal to Accept Medical Care" stating that he was refusing a medical appointment because "don't like available provider I think he discriminates against me." (DN 34-5). Plaintiff was next assessed by a medical provider at KSP

---

[4] "ASA" is an "abbreviation on a medication that indicates it contains acetylsalicylic acid (aspirin)." MedicineNet, ASA (drug caution code), https://www.medicinenet.com/script/main/art.asp?articlekey=13908 (last visited Oct. 18, 2017).

on July 24, 2013, because he was again requesting renewal of his naproxen prescription. (DN 34-6). Plaintiff's records from this visit indicate that he was given a two-week prescription of 500 mg naproxen to take twice daily. (DN 34-6). On August 7, 2013, Plaintiff requested a renewal of this prescription for back pain but his medical records indicate that his request was denied because "MD states he has off of it x 2 weeks before he will renew it." (DN 34-7). Plaintiff made another request for a naproxen prescription on September 18, 2013, but was again told that it was not time. (DN 34-8). On November 20, 2013, Plaintiff made another request for a naproxen prescription, and the progress notes reflect that "Dr. Hiland said renew it if its time." (DN 34-11).

On September 16, 2013, Plaintiff filed a second grievance regarding a TENS unit. (DN 34-9, p.2). In this grievance, Plaintiff complained that Dr. Hiland had deprived him of a TENS unit in violation of his constitutional rights. (*Id*.). Plaintiff stated that he believed this was "discriminatory treatment" and noted that he was allowed to use a TENS unit at pill call while he was in segregation at NTC. This grievance was rejected for the following reason: "No date indicating when Dr. denied you the tens unit." (DN 34-9, p. 5).

Finally, a medical x-ray of Plaintiff's spine on September 9, 2014, showed that despite Plaintiff's claim of a bulging disc, there was "no evidence of fracture, destructive bony lesion, or instability" and "[D]isc space areas and posterior elements are normal. Soft tissue are normal." (DN 39-2).

### 2. Tinnitus

Upon his arrival at KSP, Plaintiff filed a grievance requesting that he be seen by a specialist regarding his tinnitus, as he had been scheduled to do before being transferred from NTC. (DN 1-1, p. 5). There are no records which show how this grievance was resolved.

However, the first medical records from KSP related to Plaintiff's tinnitus begin on May 10, 2011. This record shows that Plaintiff complained that he had had noise in both ears for five years and that Dr. Hiland examined his ears, found his "TM and auditory canal are WNL," and concluded that no treatment was indicated. (DN 34-13). During Plaintiff's August 30, 2011, annual physical, the exam record reflects that Plaintiff made no subjective complaints regarding his ears, although, upon an examination of Plaintiff's ears, the medical provider found "yellow to brown, sticky to hard cerumen, obscuring drum." (DN 34-14, pp. 1-2). Plaintiff was then examined on November 1, 2012, complaining of "pain left ear, runny nose, NP cough"; was diagnosed with "left otitis media"; and was prescribed amoxicillin and prednisone. (DN 34-15, pp. 1-3). Then, on November 21, 2012, Plaintiff was seen by Dr. Hiland after complaining of "painful lt. ear for a few years." (DN 34-16). The medical records indicate that, upon examination of Plaintiff, Dr. Hiland concluded that Plaintiff was suffering from a "muscle spasm" and prescribed him dexamethasone. On December 6, 2012, Dr. Hiland performed Plaintiff's second annual physical examination at KSP. (DN 34-17, pp. 1-2). On this date, the exam record shows no complaints regarding Plaintiff's ears and indicates that, upon examination, Dr. Hiland found Plaintiff's "hearing normal, tympanic membranes intact, external and middle ear anatomy normal." (*Id*.).

On October 3, 2013, Plaintiff filed another grievance stating that he had suffered severe ear pain for six years and asked to see a specialist as he had been scheduled to do before being transferred from NTC in 2010. (DN 1-1, p. 6). This grievance was rejected because Plaintiff did not identify on what date Dr. Hiland refused to refer him to a specialist.

On March 1, 2014, Plaintiff was seen by another physician for his complaints of "ringing/pressure" in his ears. (DN 17-1, p. 16, Aff. Dr. Judd Bazzel). Dr. Bazzel found that

Plaintiff's ears were full of wax and prescribed wax removal drops. When these drops did not improve his symptoms, he was referred to a specialist. (*Id.*). In his affidavit, Dr. Bazzel stated, that "tinnitus may cause trouble hearing, working, or even sleeping, but does not require immediate treatment." (*Id.*). On August 13, 2014, Plaintiff was seen by an audiologist and fitted for hearing aids. (DN 39-1). The audiologist noted that "the purpose of the fitting was not only to assist his hearing loss but also to assist in masking out of the subjective tinnitus." (*Id.*).

### III. LEGAL STANDARD

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence of the non-moving party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In addition, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Id.* at 586. Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed.

R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. It is against this standard that the Court reviews the facts presented.

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In his motion for summary judgment, Plaintiff argues that he is entitled to relief because Defendants' failed to comply with the Court's April 25, 2017, Memorandum and Order permitting Defendants to file a properly supported motion for summary judgment within 30 days. However, Defendants timely filed their second motion for summary judgment on May 25, 2017. Moreover, to the extent that Plaintiff claims that he did not receive a copy of the motion for summary judgment, the Court ordered that he be provided a copy on August 23, 2017 (DN 120). Plaintiff then filed his response to Defendants' second motion for summary judgment on August 30, 2017 (DN 121). Thus, Plaintiff's motion for summary judgment will be denied.

## V. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In their second motion for summary judgment, Defendants Dr. Hiland and Warden White claim that they are entitled to relief on all of Plaintiff's remaining claims against them.

### A. 42 U.S.C. § 1983 CLAIMS

Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). Two elements are required to state a claim under § 1983. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "A plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person

acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "Absent either element, a section 1983 claim will not lie." *Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991).

### 1. Deliberate Indifference to Serious Medical Needs

The Eighth Amendment protects convicted prisoners from the "unnecessary and wanton infliction of pain." U.S. Const. amend. VIII. An Eighth Amendment claim requires a plaintiff to prove two distinct components - one objective and one subjective. First, the alleged deprivation must be, objectively, "sufficiently serious," *i.e.*, the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1970) (citations and internal quotation marks omitted). Second, the official must have been "deliberately indifferent" to the inmate's health or safety. *Id.*

To satisfy the objective component of an Eighth Amendment deliberate indifference claim, Plaintiff must show the existence of a sufficiently serious medical need. "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citations and internal quotation marks omitted).

The subjective component of the Eighth Amendment standard is met "where a plaintiff demonstrates that prison officials acted with 'deliberate indifference' to a serious medical need," which "is the equivalent of 'recklessly disregarding that risk.'" *McCarthy v. Place*, 313 F. App'x 810, 814 (6th Cir. 2008) (quoting *Farmer*, 511 U.S. at 836). In other words, "[s]atisfying the objective component ensures that the alleged deprivation is sufficiently severe, while satisfying the subjective component 'ensures that the defendant prison official acted with a sufficiently culpable state of mind.'" *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir.

2013) (quoting *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003)). Under the subjective

prong, a plaintiff must show: (1) "the official being sued subjectively perceived facts from which

to infer substantial risk to the prisoner"; (2) the official "did in fact draw the inference"; and

(3) the official "then disregarded that risk." *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th

Cir. 2014).

In addition, in *Alspaugh v. McConnell*, the Sixth Circuit held as follows:

> "[W]e distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Where a prisoner alleges only that the medical care he received was inadequate, "federal courts are generally reluctant to second guess medical judgments." *Id*. However, it is possible for medical treatment to be "so woefully inadequate as to amount to no treatment at all." *Id*.

643 F.3d 162, 169 (6th Cir. 2011).

Moreover, a prisoner's right is to medical care, not to the type or scope of medical care

which he personally desires. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle v.*

*Gamble*, 429 U.S. at 103-04). The Constitution does not guarantee a prisoner the treatment of

his choice. *Ledoux v. Davies*, 961 F.2d 1546, 1537 (10th Cir. 2002).

### a. Chronic Lower Back Pain

Plaintiff first claims that Dr. Hiland was deliberately indifferent to his chronic lower back

pain by refusing to treat his pain with a TENS unit and by failing to regularly prescribe him

prescription pain medication beginning in 2013. The Court first notes that Defendants do not

seem to dispute that Plaintiff's chronic lower back pain constitutes a serious medical condition.

Moreover, several courts have recognized that back pain can constitute a serious medical need.

*See, e.g.*, *Murphy v. Grenier*, 406 F. App'x 972, 975 (6th Cir. 2011) (finding "extreme pain due

to [a] back condition" is a serious medical need); *Logan v. Clarke*, 119 F.3d 647, 649 (8th Cir.

1997) (holding that "substantial back pain" is a serious medical need); *Crowell v. Abdellatif*, No. 15-13825, 2017 U.S. Dist. LEXIS 47814, at *11 (E.D. Mich. Mar. 8, 2017) ("Plaintiff meets the objective prong of a deliberate indifference claim in that has the sufficiently serious medical condition of . . . back pain. . ."). However, the Court need not determine whether a reasonable jury could find that Plaintiff's chronic lower back pain was a serious medical need, because Plaintiff cannot establish that Dr. Hiland was deliberately indifferent to that need.

### i. TENS Unit

Plaintiff claims that Dr. Hiland recklessly disregarded his chronic lower back pain by refusing to prescribe a TENS unit for his use at KSP. In support of this claim, Plaintiff points to the fact that a physical therapist recommended a TENS unit for Plaintiff's back pain while he was incarcerated at NTC and that prison officials there permitted him to use the TENS unit, even while he was in segregation, for 30 minutes, three times a day, at pill call, as needed.

These facts fail to establish that Dr. Hiland had a "sufficiently culpable state of mind" when he decided not to prescribe a TENS unit for Plaintiff's lower back pain. The record reflects that although a physical therapist at another facility recommended a TENS unit for the treatment of Plaintiff's lower back pain, Dr. Hiland believed that he could treat Plaintiff's lower back pain with pain medication alone. Thus, Plaintiff's claim rests upon a difference in judgment between two medical professionals, and a difference in judgment is not sufficient to show that Dr. Hiland was acting with deliberate indifference. *See Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 U.S. App. LEXIS 28322 (6th Cir. Oct. 29, 1996). Moreover, there is no evidence in the record that Plaintiff requested the use of a TENS unit for his back pain at any time between the dates of the grievances he filed regarding a TENS unit - the first in 2010 and the second in late 2013, shortly before the filed this

action.[5]  In addition, the records from Plaintiff's 2011 and 2012 annual physical exams reflect that he made no subjective complaints of pain during these examinations and that no abnormal findings were made with regard to his back.  Thus, the Court concludes that no reasonable jury could find that Dr. Hiland was deliberately indifferent to Plaintiff's pain when he refused to issue Plaintiff a TENS unit upon his arrival at KSP.

### ii. Pain Medication

Plaintiff next claims that Dr. Hiland was deliberately indifferent to his chronic lower back pain, beginning in 2013, by failing to regularly prescribe him naproxen.  According to Plaintiff's medical records, on February 28, 2013 and March 12, 2013, Plaintiff requested to see a medical provider at KSP because his prescription for naproxen "cancelled."  On March 12, 2013, Plaintiff was examined by a medical provider at KSP for his back pain.  This examination produced "normal" results, showing "no tenderness to vertebral spine to soft tissue of back . . . normal distal sensory and motor functions."  (DN 34-3).  Based upon this examination, Plaintiff was informed that he could procure over-the-counter pain medication from the commissary.  However, a grievance then filed by Plaintiff regarding this issue suggests that inmates who had been placed in segregation could not buy over-the-counter pain medications at KSP.  Then, on April 1, 2013, Plaintiff completed a form requesting to see "Dr. Steve Hiland (ONLY)" for his severe back pain, but Plaintiff was informed that "you do not get to pick which provider you see."  (DN 34-4).  Plaintiff's medical records next show that he began refusing to receive medical treatment on April 10, 2013, because he believed the "provider" was discriminating against him.  It appears that Plaintiff did not request medical care again until July 24, 2013, when

---

[5] Although Plaintiff notes that he was not allowed to use a TENS unit at KSP in his February 28, 2013, sick-call request, it is seemingly mentioned to explain why KSP officials should not have cancelled his naproxen prescription at that time.  Moreover, Plaintiff did not make a request for a TENS unit on March 12, 2013, when he was seen by a KSP medical provider in response to this sick-call request.

a nurse renewed Plaintiff's naproxen prescription for two weeks upon Plaintiff's request. After this prescription expired, Plaintiff was advised on August 7, 2013, that the "MD," which the Court presumes is Dr. Hiland, had directed that Plaintiff had to be off the prescription for two weeks before he would renew it. (DN 34-7). Plaintiff then requested prescription pain medication again on September 18, 2013, and a nurse responded: "MD told him it's not time. No new orders." (DN 34-8). A sick call note from November 20, 2013, reflects that Plaintiff again requested renewal of his naproxen prescription and "Dr. Hiland said renew if it's time." (DN 34-11). Finally, a medical x-ray of Plaintiff's spine on September 9, 2014, showed that despite Plaintiff's claim of a bulging disc, there was "no evidence of fracture, destructive bony lesion, or instability" and "[D]isc space areas and posterior elements are normal. Soft tissue are normal." (DN 39-2).

The Court finds that, based upon this evidence, no reasonable jury could conclude that Dr. Hiland was deliberately indifferent to a serious medical need regarding Plaintiff's pain medication. Although it appears that Plaintiff's prescription for naproxen was cancelled in early 2013, the record does not reflect who cancelled the prescription. Moreover, upon a physical examination of Plaintiff's back on March 12, 2013, a medical provider determined that Plaintiff no longer needed prescription naproxen to treat his back pain. Thereafter, Plaintiff only irregularly requested prescription naproxen in 2013, and Dr. Hiland renewed the prescription on the occasions he deemed appropriate. In *Stockmeyer v. Fetroe*, the district court considered a physician assistant's decision to reduce a prisoner's naproxen prescription. No. C16-5614 BHS-TLF, 2017 U.S. Dist. LEXIS 150231 (W.D. Wash. Aug. 24, 2017). The court held that there was no evidence that this amounted to deliberate indifference because there was "no evidence that the treatment provided by [the physician's assistant] was inappropriate in light of [the

plaintiff]'s medical conditions or that the treatment did not meet the medical standard of care." *Id*. at 19. The court continued: "Further, there is no evidence of an excessive risk to [the plaintiff]'s health resulting from . . . the amount of Naproxen prescribed." *Id*. The Court concluded that this amounted to no more than a difference of opinion between the prisoner-patient and his medical provider. *Id*.; *see also Mena v City of New York*, No. 13-CV-2792 (NGG) (LB), 2016 U.S. Dist. LEXIS 46132, at *22 (E.D.N.Y. Mar. 31, 2016) (holding no deliberate indifference where prisoner disagreed with medical provider over how much pain medication should be prescribed because merely an issue of "medical judgment"). Simply put, no reasonable juror could conclude that Dr. Hiland's decision not to renew Plaintiff's prescription for naproxen on two occasions in 2013 amounts to deliberate indifference, especially after another medical provider concluded upon examination of Plaintiff that such a prescription was no longer medically necessary. *See also Fox v. Brown*, No. 9.05-CV-1292 (GTS/GJD), 2009 U.S. Dist. LEXIS 38312, at *17 (N.D.N.Y. May 6, 2009) ("[G]iven that pain medication is ordered based upon medical judgment, a medical decision not to order pain medication (while it might give rise to negligence) cannot give rise to the sort of criminal recklessness necessary for there to be *deliberate indifference* to a serious medical need.")

For these reasons, the Court will grant Dr. Hiland summary judgment on this claim.

### b. Tinnitus

Plaintiff next claims that Dr. Hiland was deliberately indifferent to his serious medical needs because he failed to refer Plaintiff to a specialist for tinnitus, even though a medical provider at his prior institution had requested an ENT consult because Plaintiff had been treated with "multiple combinations of medication without symptom relief." (DN 9-1). Here, the Court finds that it need not determine whether tinnitus is a serious medical need, because even if it is,

14

no reasonable jury could conclude, based upon the record before the Court, that Dr. Hiland was deliberately indifferent to this need.

The first medical records from KSP related to Plaintiff's tinnitus begin on May 10, 2011.[6] On this date, Plaintiff complained that he had noise in both ears for five years. Dr. Hiland examined Plaintiff's ears and found "TM and auditory canal WNL" and concluded that "no treatment [was] indicated." (DN 34-13). Moreover, Plaintiff's medical record from his August 30, 2011, annual physical exam reflects that Plaintiff made no subjective complaints about any physical condition. On November 1, 2012, Plaintiff was seen by an APRN due to complaints of "pain left ear, runny nose, and NP cough." Based upon this examination, Plaintiff was prescribed amoxicillin and prednisone. Then, on November 21, 2012, Plaintiff was seen by Dr. Hiland based upon Plaintiff's complaints of "paintful lt. ear for a few years." (DN 34-16). Upon examination, Dr. Hiland concluded that Plaintiff was probably suffering from a "muscle spasm" and prescribed him dexamethasone. (Id.). On December 6, 2012, Dr. Hiland conducted Plaintiff's second annual physical exam at KSP. During this examination, Plaintiff made no subjective complaints regarding his ears to Dr. Hiland and Dr. Hiland made the following findings with regard to Plaintiff's ears: "hearing normal, tympanic membranes intact, and external and middle ear anatomy normal." (Id.) On March 1, 2014, Plaintiff was seen by another physician for his complaints of "ringing/pressure" in his ears. (DN 17-1, p. 16, Aff. Dr. Judd Bazzel). Dr. Bazzel found that Plaintiff's ears were full of wax and prescribed wax removal drops. When these drops did not improve his symptoms, he was referred to a specialist. (Id.). Dr. Bazzel stated, however, that "tinnitus may cause trouble hearing, working, or even

---

[6] On May 5, 2010, Plaintiff filed a grievance at KSP in which he indicated that he had been in severe pain and heard loud noises in his ears for over two years and requested to be referred to a specialist as he had been at NTC. Neither party seems to have attached any record which shows how this grievance was resolved. The grievance itself does not mention Dr. Hiland.

sleeping, but does not require immediate treatment." (Id.). On August 13, 2014, Plaintiff was

seen by an audiologist and fitted for hearing aids. The audiologist noted that "the purpose of the

fitting was not only to assist his hearing loss but also to assist in masking out of the subjective

tinnitus." (DN 39-1).

According to the National Institute of Health, tinnitus is often described as a "ringing in

the ears," but it can "also sound like roaring, clicking, hissing, or buzzing and it may be soft or

loud, high pitched or low pitched." NIH, U.S. National Library of Medicine, Medline Plus,

Tinnitus, https://medlineplus.gov/tinnitus.html (last visited Oct. 18, 2017). The record above

shows that Plaintiff only directly complained to Dr. Hiland regarding "noise" or "ringing" in his

ears on one occasion. On this occasion, Dr. Hiland examined his ears and found "TM and

auditory canal WNL" and concluded that "no treatment [was] indicated." Significantly, this

record does not reflect that Plaintiff advised Dr. Hiland that he had been diagnosed with tinnitus

or that Plaintiff requested referral to a specialist at that time.[7] Although Dr. Hiland could

arguably have learned such information from a review of Plaintiff's medical records from NTC,

the Sixth Circuit has held that failure to check medical records is "negligence at most."

*Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir. 1665) ("While perhaps in hindsight

[defendant] should have checked [inmate's] medical history records, her failure to do so is

negligence at most."). Thus, because the record before the Court shows that Dr. Hiland treated

and examined Plaintiff on the one occasion Plaintiff complained to him about ringing in his ears,

the Court finds that no reasonable jury could find that Dr. Hiland "recklessly disregarded" a

substantial risk to Plaintiff's health by failing to refer him to a specialist. Moreover, although

---

[7] The remainder of the records submitted to the Court regarding Plaintiff's ears show that Plaintiff did sometimes complain about pain in his ears, and that, on these occasions, Plaintiff was seen by another medical provider and treated for the underlying condition the medical provider believed was causing Plaintiff's pain. These same records also show that Plaintiff made no subjective complaints regarding his ears during his 2011 or 2012 annual physical examinations.

Dr. Hiland may not have properly diagnosed Plaintiff on this occasion or provided appropriate treatment for tinnitus, this evidence also fails to establish that Dr. Hiland was deliberately different to Plaintiff's tinnitus. *See, e.g.*, *Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010) ("[T]o prevail on a deliberate-indifference claim, an 'inmate must show more than negligence or the misdiagnosis of an ailment.'" (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

For these reasons, the Court will grant Dr. Hiland summary judgment on this claim.

## 2. Retaliation

Plaintiff also makes a First Amendment retaliation claim against Dr. Hiland. In the Sixth Circuit:

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). The plaintiff has the burden of proof regarding all three elements. *See, e.g.*, *Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003); *Green v. Tudor*, 685 F. Supp. 2d 678, 692 (W.D. Mich. 2010). Moreover, the plaintiff must prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). If the plaintiff makes such a showing, the defendants may still avoid liability by showing "that [they] would have taken the same action in the absence of the protected activity." *Whiteside v. Parrish*, 387 F. App'x 608, 612 (6th Cir. 2010) (quoting *Thaddeus-X*, 175 F.3d at 399); *Jones v. Smolinski*, No. 1:09-CV-633, 2010 U.S. Dist. LEXIS 143638 (W.D. Mich. Aug. 31, 2010).

It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D. Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)).

With regard to the first element, Plaintiff claims that Dr. Hiland retaliated against him for filing his September 16, 2013, grievance against Dr. Hiland (regarding the TENS unit) by refusing to renew his naproxen prescription September 18, 2013. The filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith v. Campbell*, 250 F.3d at 1037; *Hall v. Nusholtz*, No. 99-2442, 2000 U.S. App. LEXIS 28002, 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000); *Burton v. Rowley*, No. 00-1144, 2000 U.S. App. LEXIS 28000, 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000).

With regard to the second element, although Plaintiff's medical records show that he was denied a naproxen renewal on September 18, 2013, because the "MD told him it's not time," the Court finds that it need not determine whether a reasonable jury could conclude that this was an adverse action. This is because Plaintiff has not presented sufficient evidence upon which a jury could find that the filing of Plaintiff's grievance on September 16, 2013, was a motivating factor in Dr. Hiland's decision not to prescribe Plaintiff naproxen two days later. First, there is no evidence that Dr. Hiland knew that Plaintiff had filed this specific grievance against him when he declined to renew Plaintiff's naproxen prescription. Indeed, the evidence actually indicates that

Dr. Hiland did not know about the grievance since it was rejected by the grievance coordinator in its initial stages for failing to include a date.[8]  Second, Plaintiff's medical records show that his naproxen prescription was first "cancelled" by an unknown medical provider in early 2013, long before he filed the relevant grievance.  These same records also show that, based upon his request for a medication renewal, Plaintiff was examined on March 12, 2013.  During this examination, it was noted that Plaintiff had "no tenderness to vertebral spine to soft tissue of back [and] normal distal sensory and motor functions."  Moreover, although Dr. Hiland advised Plaintiff's medical provider that it was not time to renew his prescription on September 18, 2013, when Plaintiff next returned to medical seeking a prescription renewal, Dr. Hiland said "renew if its time."  The fact that Plaintiff was first taken off his prescription naproxen and denied a prescription renewal well before he filed his grievance and that his prescription was renewed following the filing of his grievance further suggests to this Court that no jury could reasonably conclude that Dr. Hiland's decision not to renew Plaintiff's naproxen prescription for two weeks on September 18, 2013, was substantially motivated by the filing of Plaintiff's grievance.

For these reasons, the Court will grant Defendants' motion for summary judgment on this claim.

### 3. Discrimination

Plaintiff also claims that Dr. Hiland denied him medical treatment based upon Plaintiff's race.  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v.*

---

[8] In his response, Plaintiff objects strenuously to Defendants' argument that Dr. Hiland did not know that Plaintiff had filed a grievance against him on September 16, 2013.  However, in support of this objection, Plaintiff points to Dr. Hiland's response to his 2010 grievance regarding Dr. Hiland's denial of a personal TENS unit for Plaintiff and not to Plaintiff's September 16, 2013, grievance regarding the same issue.

*Cleburne Living Center*, 473 U.S. 432, 439 (1985).  To establish an equal protection claim

under § 1983, a plaintiff must show that he is a member of a protected class and that he was

intentionally and purposefully discriminated against because of his membership in that protected

class. *Jones v. Union Cty. Tenn*, 296 F.3d 417, 426 (6th Cir. 2002); *Herron v. Harrison*, 203 F.3d

410, 417 (6th Cir. 2000); *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir.1990).  To

establish a violation of the Equal Protection Clause in the context of a racial discrimination

claim, an inmate must prove that a racially discriminatory intent or purpose was a factor in the

decision of the prison officials.  *Copeland v. Machulis*, 57 F.3d 476, 480 (6th Cir. 1995).  To

avoid summary judgment on an equal protection claim, a plaintiff must "identify affirmative

evidence from which a jury could find [proof of] the pertinent motive," race discrimination.

*Crawford—El v. Britton*, 523 U.S. 574, 600 (1998).

　　　　"A plaintiff presenting a race-based based equal protection claim can either present direct

evidence of discrimination, or can establish a prima facie case of discrimination under the

burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973)." *Umani v. Mich. Dept. of Corr.*, 432 F. App'x  453, 458 (6th Cir. 2011).  "Direct

evidence is composed of only the most blatant remarks, whose intent could mean nothing other

than to discriminate on the basis of some impermissible factor."  *Id*.  Plaintiff has not presented

any direct evidence of discrimination.  Plaintiff also failed to make a prima facie showing of

discrimination under the indirect burden-shifting framework of *McDonnell Douglas* because he

has not presented any evidence that Dr. Hiland treated him differently than any similarly-situated

white prisoner.  *Id*.  Thus, because Plaintiff has failed to meet his burden of coming forward with

the evidence that would create triable issues of fact regarding whether Dr. Hiland denied him

medical treatment because of his race, Dr. Hiland is entitled to summary judgment on this claim.

### 4. Exhaustion and Qualified Immunity

In the motion for summary judgment, Dr. Hiland also argues that he is entitled to summary judgment because Plaintiff has failed to exhaust available administrative remedies and because Dr. Hiland is entitled to qualified immunity. However, because the Court concludes that Dr. Hiland is entitled to summary judgment on the merits of the § 1983 claims against him, the Court need not address these arguments.

### B. STATE-LAW CLAIMS

The Court's grant of summary judgment to Dr. Hiland on Plaintiff's § 1983 claims leaves before the Court only Plaintiff's state-law negligence claim against Dr. Hiland and his state-law negligent retention claim against Warden White. Where, as here, a district court has dismissed all of the claims over which it had original jurisdiction, the court may decline to exercise supplemental jurisdiction over the remaining claims. *See* 28 U.S.C. § 1367(c)(3). The decision whether to exercise supplemental jurisdiction over a claim is purely discretionary and depends on judicial economy, convenience, fairness, and comity. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). As a rule of thumb though, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc.*, 89 F.3d at 1254-55. Indeed, as the Sixth Circuit has observed: "[T]he Supreme Court's general comity-related principle [is] that residual supplemental jurisdiction be exercised with hesitation, to avoid needless decisions of state law." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).

In light of these guiding principles, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state- law claims and will therefore deny Defendants' motion for summary judgment on these claims without prejudice.

## VI. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that that Plaintiff's motion for summary judgment (DN 99) is **DENIED** and Defendants' motion for summary judgment (DN 98) is **GRANTED in part** and **DENIED in part.  Plaintiffs' remaining state-law claims are DISMISSED without prejudice.**

Date:  October 24, 2017

**Greg N. Stivers, Judge**
**United States District Court**

cc:     Plaintiff, *pro se*
         Counsel of Record
4416.011